**Willie ALLEN et al., Plaintiffs,**

v.

**CITY OF MOBILE et al., Defendants.**

**Civ. A. No. 5409–69–P.**

United States District Court, S. D. Alabama, S. D.

Sept. 29, 1978.

---

James U. Blacksher, Mobile, Ala., Jack Greenberg, New York City, for plaintiffs.

Mylan R. Engel, Wm. H. Brigham, Fred G. Collins, Mobile, Ala., for defendants.

## OPINION AND ORDER

PITTMAN, Chief Judge.

The plaintiffs have brought a class action against the City of Mobile and the Mobile County Personnel Board alleging that the promotional system used to determine which patrolmen advance to the rank of sergeant in the Mobile City Police Department is discriminatory both under the Fourteenth Amendment to the United States Constitution and under Title VII (42 U.S.C. § 2000(e), *et seq.*) This proceeding was initiated by plaintiffs' motion for a preliminary injunction and additional relief, filed on or about January 14, 1977, as amended on or about October 18, 1977. Pursuant to that motion, the court issued on January 14, 1977, a temporary restraining order prohibiting the defendants from making permanent promotions to the rank of sergeant and lieutenant in the Mobile Police Department occurring on or after January, 1977, pending a hearing on plaintiffs' motion for a preliminary injunction. The temporary restraining order provided that such promotions would be provisional and subject to the further orders of this court.

The parties have agreed that as of the present time practices governing promotion from sergeant to lieutenant cannot be an issue in this lawsuit since in recent years there have been no black sergeants and, thus, no blacks eligible to be considered for lieutenant.

By order dated February 10, 1978, this court dissolved the temporary restraining order as it applied to persons promoted to lieutenant.

The City of Mobile was added by amendment as a party defendant. Prior to the Title VII claims being instituted, the City had been dismissed on grounds that it was not a "person" subject to suit under 42 U.S.C. § 1983. All parties concede the City is properly before the court as a defendant subject to plaintiffs' Title VII claims.

On September 9, 1971, this court entered a final judgment and decree on the original complaint in this action. *Allen v. City of Mobile*, 331 F.Supp. 1134 (S.D. Ala. 1971), *aff'd.* 466 F.2d 122 (5th Cir. 1972), *cert. denied* 412 U.S. 909, 93 S.Ct. 2292, 36 L.Ed.2d 975 (1973). In that decree, this court retained jurisdiction over this cause for the purpose of monitoring compliance with its order and, in addition, to consider such further relief as may be required. Reports by the defendants were ordered to be filed periodically with the court.

In that decree, the court found that the written examinations used to screen candidates for promotion from patrolman to sergeant did not violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. 331 F.Supp. *supra* at 1145–48. However, the court concluded that the defendants should proceed on their own to study the empirical relationship between officers' scores on the written examinations and subsequent performance demonstrated by those officers promoted to sergeant. In this regard, the court ordered that the statistical analyses of this relationship be reported on an annual basis to the court. 331 F.Supp. *supra* at 1151–52.

Subsequent to this court's 1971 decision, Congress, in March of 1972, amended Title VII of the Civil Rights Act of 1964 to bring within its scope federal, state, and local governmental employees. The employment practices of the defendants subsequent to March 1972 are therefore subject to scrutiny for compliance with the statutory requirements of Title VII as well as the Fourteenth Amendment.

Plaintiffs alleged in their January 1977 motion that black officers James Huey, Isaic George, and Ernest Morrison had, on January 13, 1977, filed charges with the Equal Employment Opportunity Commission (EEOC) alleging that the defendants' use of written examinations and performance ratings violated their rights under Title VII. On or about October 18, 1977, plaintiffs amended their motion by filing right-to-sue letters they received on or

about July 28, 1977, from the Attorney General of the United States.

The court finds that three of the named plaintiffs filed an EEOC complaint within 180 days after the alleged unlawful employment practice, that is, the giving of the 1976 sergeant's examination. The plaintiffs did not, however, file an EEOC complaint with reference to the 1973 examination and the court finds that it has no jurisdiction to examine the 1973 examination under Title VII standards since the statutory prerequisites for such review have not been met.

This court has subject-matter jurisdiction over the plaintiffs' claims that the employment practices with reference to the 1976 sergeant's examination violated their rights under Title VII of the Civil Rights Act of 1964 as last amended.

## FINDINGS OF FACT

In its 1971 *Allen* decree this court determined that historically the defendants purposefully discriminated against blacks by their employment practices. 331 F.Supp. *supra* at 1142. At one time, prior to 1954, blacks were not employed at all by the Mobile Police Department. The court also found that there was discrimination in the delegation of specific duties and assignment to departments, patrol areas, etc. This court ordered various remedial procedures. The promotional tests being used at that time were found by the court to be job-related. Because of the relatively small size of the police department personnel plus the time and expense involved in developing new tests, the defendants were not prohibited from using the written examinations. However, the discriminatory effects of seniority as a factor in the promotional procedures were rectified and the regular and special service ratings were upgraded. The court retained jurisdiction of these matters. Expressly and implicitly in the decree it was clear the defendants were to continue their efforts to upgrade the written examination to remove discrimination against the blacks. The defendants were required to file annually with the court statistical analyses of the relationship between officers' test scores and their later performance after promotion to the positions sought. The defendants filed intermittently over the last six years essentially raw data with reference to later ratings, but did not make, and have not made, any meaningful statistical analyses of this information as originally ordered by the court in 1971.

Since the 1971 decree, examinations for promotion to sergeant have been administered twice, in March 1973 and in December 1976. Twenty-eight officers were promoted to sergeant as a result of the March 1973 examination. Twelve officers were promoted to sergeant in January 1977 based on the December 1976 examinations. In January 1978, three more officers were promoted from the same seniority list developed after the December 1976 examination. All of the promotees have been white.

On both occasions that the written sergeants examination was administered, the test proved to have a severe adverse impact on the opportunities of black officers to be promoted to sergeant. On the 1973 examination, which had a total of 200 questions, blacks on the average scored almost 12.46 fewer correct answers than whites, resulting in lower adjusted (normalized to a 100% scale) test scores among blacks of approximately 6.23 points. Black officers fared even worse on the 1976 sergeants examination which consisted of 145 questions (122 items from the 1973 exam, 10 partially changed items, 13 new items) in that the disparity between the adjusted test scores of blacks and whites rose precipitously to 16.77 points in favor of the latter.

The plaintiffs and defendants' experts both agree that the service ratings should be upgraded. The court finds the differences between the whites and blacks' regular service ratings have a statistically significant adverse racial impact on blacks. The racial impact of the special service ratings were not statistically significant. This indicates the written test, its application by using the passing test grade to rank the order of promotion, and the regular service rating with assigned weights to the tests and other promotional factors have been

stumbling blocks to black patrolmen being promoted to sergeant.

It has been approximately seven years since the 1971 decree. It has been approximately one and one-half years since this court issued a temporary restraining order preventing the promotions to sergeants based on the 1976 promotion examination from becoming permanent pending a hearing. In spite of the explicit and implicit intent of the 1971 order, the amendment of the Title VII act in 1972 to include local governments, the statistical results of the 1973 and 1976 examinations, and the known adverse racial impact against the blacks, the defendants did not undertake to upgrade or examine promotional examinations to sergeant in a serious way until mid-February of this year, and, then, in preparation for the hearing just concluded.

The substantial statistically significant differences in the test scores and of the regular service ratings of blacks and whites support the conclusion that these parts of the promotional process (which also include seniority ratings and special service ratings) with assigned weights to each factor, have an identifiable adverse racial impact on black candidates for sergeant.

Following the 1976 tests and the weighted formula used by the defendants to rank the eligible candidates on the promotion register, 15 sergeant vacancies have been temporarily filled. No blacks ranked in the first 15 on the register.

It has been determined that there now exist four more sergeant vacancies with two additional vacancies to occur in the near future. This makes a total of 21 vacancies for the court's consideration.

If promotions had been determined from a pass/fail eligibility list after deleting the questions the defendants' expert testified should be deleted and by adjusting the scores, not assigning a rank by grades, and not weighting the written test but other non-discriminatory promotion factors, black officer Walter Pickett would have ranked

# 2, and black officer James Huey would have ranked # 21.[1] Black officer Hubert Bell passed the 1973 test but failed the 1976 test. However, his regular and special service ratings are among the highest of all the candidates, black and white. For years he has performed the duties of sergeant without rank with great distinction. He has received public praise for his work from the Police Commissioner and the Police Chief.

## CONCLUSIONS OF LAW

This court's original 1971 decree in this action was based on an alleged constitutional violation of the Equal Protection Clause of the Fourteenth Amendment because of racial discrimination. There were no Title VII allegations in that complaint. The allegations in this decree arise out of alleged Title VII violations as to the written tests and accompanying promotional procedures in establishing the promotion register, i.e., those eligible for promotion and the rank of each person. Therefore, the results in this opinion are different from the 1971 opinion because the standards applicable to the alleged Fourteenth Amendment violations and the standards as to the alleged Title VII violations are not the same for evaluating test and promotion procedures.

The use of written examinations is condoned for pre-employment and promotional qualification purposes by Title VII. The pertinent statutory provisions state:

"Notwithstanding any other provision of this subchapter . . . [it shall not] be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, [or] color . . . ."

42 U.S.C. § 2000e–2(h). Construing this provision, the Supreme Court declared:

---

1. Black officer Ernest D. Morrison would have ranked # 19. He has now retired. Such relief as he may have been granted would not have

entitled him to back pay nor change his retirement benefits.

"Nothing in [Title VII] precludes the use of testing or measuring procedures; obviously they are useful. *What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance.*"

*Griggs v. Duke Power Co.*, 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158, 167 (1971) (emphasis supplied). It is the nondiscriminatory qualification on employment tests that is of primary importance in the enforcement of Title VII rights. Proof of job-relatedness is essential.

■ Two years after the *Griggs* decision, Justice Powell wrote for the Court on the import of *Griggs.*

"[*Griggs*] dealt with standardized testing devices which, however neutral on their face, operated to exclude many blacks who were capable of performing effectively in the desired positions. *[Griggs] was rightly concerned that childhood deficiencies in the education and background of minority citizens, resulting from forces beyond their control, not be allowed to work a cumulative and invidious burden on such citizens for the remainder of their lives.*"

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 806, 93 S.Ct. 1817, 1826, 36 L.Ed.2d 668, 680 (1973). The court's interpretation of the policy of Title VII with regard to such tests is clear—their usage cannot work to deprive blacks of employment opportunities based upon their disadvantaged status in the past.

Three years ago the Supreme Court set out the three-step standard for the evaluation of allegedly discriminatory examinations used by employers in hiring and promotional practices.

"[T]he complaining party [must first make] out a prima facie case of discrimination, i.e. [show] that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. [Citation omitted] If an employer does then meet the burden of proving that its tests are 'job related,' it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.' [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668]. Such a showing would be evidence that the employer was using its test merely as a 'pretext' for discrimination. *Id.*, at 804–805, 93 S.Ct. 1817. . . . "

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280, 301 (1975). This court must pursue this tripartite course of analysis of *Albemarle* in its resolution of the plaintiffs' claims.

■ As for the first step concerning the plaintiffs' initial burden of proof, the Supreme Court decisions including *Albemarle* "make clear that to establish a *prima facie* case of discrimination, a plaintiff need only show that facially neutral standards have a disproportionate impact on minorities." *United States v. City of Chicago*, 573 F.2d 416, 421 (7th Cir. 1978). The plaintiffs have succeeded in demonstrating by statistical evidence the disparate impact of both the written test itself and its use in the overall promotional formula to the detriment of the black officers seeking to become sergeants. Therefore, a *prima facie* case of discrimination has been made.

In the second phase of the *Albemarle* approach, the focus shifts to the defendant employer who must clearly show the job-relatedness of the test as well as the manner in which it is employed in the promotion process. If the defendants had obeyed the dictates of the original decree, this court would have been furnished over the interim between then and now with statistical analyses (not just raw data) of the job-relatedness of the test as evidenced by service ratings of officers promoted to sergeants in the form of the correlations of their sergeants examination scores with their subsequent performance assessments. Instead, this court was provided with only the raw data and the results of a hastily devised content validity study of the 1976 sergeants

exam conducted almost immediately prior to the hearing on the plaintiffs' present complaint. While courts have generally been unimpressed with "eleventh-hour" attempts to validate their employment procedures, e.g., *Albemarle Paper Co., supra* 422 U.S. at 429–30, 95 S.Ct. 2362, content validity studies have been accepted and reviewed by federal courts in Title VII cases. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506, 511 (8th Cir. 1977).

A content validity study measures whether the tests' items closely approximate tasks to be performed in the position sought by the candidates for promotion. *Washington v. Davis, supra* 426 U.S. at 247 n. 13, 96 S.Ct. 2040. From the defendants' evidence, their content validity study successfully demonstrated, in their expert Dr. Allen's opinion, the substantial job-relatedness of the sergeants examination by proof of item-task correspondence. However, their study is subject to scrutiny by this court before its results can be adopted as persuasive and this court can state the defendants carried their burden of refuting the plaintiffs' *prima facie* case of discrimination.

In the *Albemarle* decision the Supreme Court employed Equal Employment Opportunity Commission (EEOC) guidelines, 29 C.F.R. Part 1607, on standards for professionally acceptable validation studies. *Albemarle, supra* 422 U.S. at 430–35, 95 S.Ct. 2362. The *Albemarle* Court measured the defendant employer's validation study against the EEOC guidelines, found deficiencies in the study based on the guideline standards and found the employer failed thereby to prove the job-relatedness of his test. The Seventh Circuit Court of Appeals recently declared with reference to the influential effect of the guidelines:

"The Supreme Court has stated that the Guidelines are entitled to considerable difference as the administrative interpretation of Title VII by the agency whose task is to enforce it. [citation omitted]. This court has stated that '[c]ompliance with these Guidelines is generally re-

quired absent some showing that a cogent reason exists for non-compliance.' *United States v. City of Chicago*, [549 F.2d 415, 430 (7th Cir. 1977)]. In our order granting in part appellant's injunction pending appeal, we emphasized that while compliance with the E.E.O.C. Guidelines was not the only possible validation method, 'the City's burden is much heavier if it has not used such a method.' "

*United States v. City of Chicago, supra* 573 F.2d at 427. This statement represents, for all practical purposes, the Fifth Circuit's position on the guidelines since it has said, too, "the Guidelines 'should be followed absent a showing that some cogent reason exists for noncompliance.' " *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1187 (5th Cir. 1976), *quoting United States v. Georgia Power Co.*, 474 F.2d 906, 913 (5th Cir. 1973). This court can find no "cogent reason" to avoid reference to the guidelines in its examination of the content validity study made by defendants' expert.

Additional clout may have attached to the guidelines the very week of this court's decision in this action. Effective September 25, 1978, the E.E.O.C. Guidelines, in revised and amplified form, have now become the *1978 Uniform Guidelines on Employee Selection Procedures* (Uniform Guidelines), 43 Fed.Reg. 38290–38315 (Aug. 25, 1978). Four federal agencies—the E.E.O.C., the Civil Service Commission, the Department of Justice, and the Department of Labor—have adopted this successor to the E.E.O.C. Guidelines after both an exhaustive study and input from numerous professional organizations as well as interested parties. It is against these *new* Uniform Guidelines that the defendants' content validity study are here appraised in the same way the predecessor E.E.O.C. Guidelines have been used by the courts.

In terms of requisite elements for a proper validity study, the Uniform Guidelines provide in Section 3B:

"[W]henever a validity study is called for by these guidelines, the user should include, as part of the validity study, and

investigation of suitable *alternative selection procedures* and suitable *alternative methods of using the selection procedure* which have as little adverse impact as possible, to determine the appropriateness of using or validating them in accord with these guidelines."

*Uniform Guidelines,* 43 Fed.Reg. at 38297 (emphasis supplied).

An enlightening commentary on this subsection, in the "Supplementary Information" or "Overview" that accompanies the Uniform Guidelines, elaborates in part V with regard to Section 3B:

> "In conducting a validation study, the employer should consider available alternatives which will achieve its legitimate business purpose with lesser adverse impact. *The employer cannot concentrate solely on establishing the validity of the instrument or procedure which it has been using in the past.*
>
> "This same principle of using the alternative *with lesser* adverse impact is applicable to *the manner in which an employer uses* a valid selection procedure."

*Id.* at 38291 (emphasis supplied).

The scope of the defendants' content validity study did not encompass either alternate methods of selection procedures or alternate ways of utilizing the existing examination in the context of the overall promotional procedure. In direct contravention of the dictates of the Uniform Guidelines, the defendant employer's study was confined to the validity of the 1976 sergeants examination. This shortcoming in the defendants' validation attempt creates a deficiency undercutting the soundness of their finding of job-relatedness.

The Uniform Guidelines contain the additional requirements for acceptable validity studies found in Sections 5G and 5H:

> "G. *Method of use of selection procedures.* The evidence of both the validity and utility of a selection procedure should support the method the user chooses for operational use of the procedure, if that method of use has a greater adverse impact than another method of use. Evidence which may be sufficient to support

the use of a selection procedure on a pass/fail (screening) basis may be insufficient to support the use of the same procedure on a ranking basis under these guidelines. Thus, if a user decides to use a selection procedure on a ranking basis, and that method of use has a greater adverse impact than use on an appropriate pass/fail basis . . . ., the user should have sufficient evidence of validity and utility to support the use on a ranking basis. * * *

> "H. *Cutoff scores.* Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force. Where applicants are ranked on the basis of properly validated selection procedures and those applicants scoring below a higher cutoff score than appropriate in light of such expectations have little or no chance of being selected for employment, the higher cutoff score may be appropriate, but the degree of adverse impact should be considered."

*Id.* at 38298.

In addition to the commentary on mandatory validation of the use of the selection procedure as set out above, the "Overview" of the Uniform Guidelines offers the following observations on the above-quoted subsections:

> "The setting of a 'cutoff score' to determine who will be screened out may have an adverse impact. If so, an employer is required to justify the initial cutoff score by reference to its need for a trustworthy and efficient work force. Similarly, use of results for grouping or for rank ordering is likely to have a greater adverse effect than use of scores solely to screen out unqualified candidates. If the employer chooses to use a rank order method, the evidence of validity must be sufficient to justify that method of use."

*Id.* at 38291–92 (footnote omitted).

Dr. Allen testified that he did not try to validate scientifically the way in which the examination was being used as a "cutoff" or threshold determinant factor as well as a

ranking device. Here again the defendant employer's study is fatally defective in its noncompliance with the Uniform Guidelines warranting condemnation of the study as incomplete and, therefore, unpersuasive for purposes of proving job-relatedness.

In summary, the failure of the defendants' content validity study to address the range of issues necessary for a true and proper validation analysis under the Uniform Guidelines implies that they have not met the heavy burden incumbent upon them to establish the job-relatedness of their challenged promotional procedures. *Albemarle, supra* 422 U.S. at 436, 95 S.Ct. 2362.

According to the Supreme Court, "[i]f an employment practice which operates to exclude [blacks] cannot be shown to be related to job performance, the practice is prohibited." *Griggs, supra* 401 U.S. at 431, 91 S.Ct. at 853. Consequently, the 1976 sergeants examination attacked here violated Title VII and the plaintiffs are entitled to a remedy.

### REMEDY

This court is invested with quite broad equitable powers under 42 U.S.C. § 2000e–5(g) empowering it to fashion that relief deemed necessary to rectify the effects of adjudged discriminatory employment practices proscribed by Title VII. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, 433 (1977). Having found an actual violation of Title VII's provisions, this court can proceed to make whole the injured parties and eliminate the remnants of past discrimination. *Furnco Construc-*

*tion Co. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957, 968 (1978).

It is hereby ORDERED, ADJUDGED, and DECREED that the defendants, individually and collectively, their agents, servants, or employees, and all persons acting at their direction or in concert with them, are hereby ENJOINED from failing to do the following:

(1) All promotions to sergeant made temporary by this court's order of January 14, 1977, are hereby made permanent. This court desires to avoid the disruptive effects that would inevitably flow from the demotions of individuals who have already fulfilled the duties of sergeant, although in a temporary capacity, for more than a year and a half who had earned the promotions under then existing procedures. No useful purpose would be served by such a regressive measure. The ends of eliminating the vestiges of racial discrimination as well as advancing equal employment opportunities for all in the future can be achieved concomitantly with the preservation of these promotions to sergeant.

(2) Black officers Walter Pickett, James Huey, and Hubert Bell are to be promoted to the grade of sergeant forthwith.[2]

Pickett's date of promotion for pay, seniority, and all other purposes shall be the same date as that of the second person promoted to sergeant since the 1976 test. Black officer Pickett will be awarded as back pay the difference between the salary he has received and the salary he would have received had he been promoted to sergeant on the date set out above. This will be determined at a later hearing.[3]

**2.** There are, or soon will have been, 21 sergeant vacancies since the 1976 promotion register was published. Fifteen white officers have heretofore received temporary promotions. These promotions have been made final by this decree. In a further effort to reach an equitable solution, and to adjust the effects of past racial discrimination, these three black officers have been ordered promoted to the rank of sergeant to fill three of the existing vacancies. All three rank within the 21. As part of the equitable solution ordered by this court, the 15 white officers' temporary promotions have

been made permanent although the court has held the 1976 test, an integral part of their ranking for promotion, to be in violation of Title VII. It appears to be equitable to consider the black officer Bell's 1973 test, which he passed although he failed the 1976 test to establish his rank for promotion for the reasons already stated. In establishing the ranking of the black officers, equal weight was given to seniority and the special service ratings which have had no significant adverse racial impact.

**3.** No back pay is awarded to officer Bell because he would not have been eligible for rank

(3) The defendants are to continue the content validity study begun by Dr. Allen to eliminate those existing test items that are either not job-related or racially unfair, and are to employ a recognized authority to formulate new written tests incorporating those findings and recommendations. The defendants will supplement the sergeants examination with items related to work behaviors not presently measured, including knowledge of local laws, regulations, procedures and conditions.[4]

(4) The defendants are to develop without delay through professional assistance a proposal for a new system for the selection of officers for promotion to sergeant. The new promotional procedure shall fully comply with the provisions of the 1978 *Uniform Guidelines on Employee Selection Procedures* and be racially non-discriminatory.

In formulating the new promotional scheme the defendants are ordered to establish a pass/fail score on any written examination.

(5) The defendants are to improve the regular and special service ratings which both parties agree is desirable.

(6) For a period of ten (10) years from this date, the following procedure is to be followed:

The results of the written examinations will be used solely to measure minimum levels of competency. They are not to be used as a ranking device. The defendants will rank those passing the written test on their seniority, regular and special service ratings (not using the written test scores). Weights attached to the ranking factors should be professionally developed and validated. Empirical data on the subsequent performance of the promotion process, including its component parts, of the blacks herein promoted and all of those hereinafter promoted, blacks and whites, under the terms of this decree, should be analyzed and evaluated.

There should be an analysis and evaluation of the performance of the 15 white officers heretofore temporarily appointed and all other sergeants whose rank was determined on the old weighted formula. The analysis and evaluation of these two groups should be compared and evaluated in an effort to determine the comparable predictability of the two procedures with a view to upgrading the written tests and the selection procedure.

All of the above analysis and evaluation should be done by professionals competent in their field.

(7) The defendants are further ordered to institute special classes and dummy examinations to prepare officer candidates for the newly developed sergeants examination.

(8) Further promotions to the grade of sergeant are not to be made prior to the adoption of the tests and procedures outlined above.

It is further ORDERED, ADJUDGED, and DECREED that the plaintiffs recover reasonable attorneys' fees and expenses from the defendants. These amounts will be determined at a later hearing.

All costs are taxed to the defendants.

based on the 1976 test and his promotion is on other equitable considerations. No back pay is awarded officer Huey because his ranking would not have placed him within the 15 promotions heretofore made.

4. The court at a later time, in conference with all attorneys, will set a time schedule for reports to the court.