Henry W. SEGAR et al., Plaintiffs

v.

Benjamin R. CIVILETTI et al., Defendants.

Civ. A. No. 77-0081.

United States District Court, District of Columbia.

Feb. 6, 1981.

James Robertson, Bruce Maximov, Thomas J. Sugrue, Judith Barry Wish, Roger M. Witten, Washington, D. C., for plaintiffs.

Davis H. Shapiro, and Royce C. Lamberth, Asst. U. S. Atty., United States District Court, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AUBREY E. ROBINSON, Jr., District Judge.

This is a class action brought against the Drug Enforcement Administration (DEA) alleging racial discrimination against Black special agents of the DEA in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* The Plaintiff class is composed of "all Blacks who currently serve as special agents, who have been discharged from special agent positions, who have unsuccessfully applied for special agent positions, and who in the future will apply for special agent positions in DEA (or in any predecessor or successor organization)." The two individual Plaintiffs are Henry W. Segar and Morris H. Davis.

Plaintiffs allege that DEA engaged in racially discriminatory practices against Black special agents and special agent applicants in all aspects of the employment process, to wit: (a) recruitment and hiring,

(b) initial grade assignments, (c) type of appointment, (d) type of work performed, (e) training, (f) discipline, (g) supervisory evaluations, (h) awards and promotions, and (i) salary. Plaintiffs' recruitment and hiring claims were settled prior to trial, and the procedures of Rule 23 of the Federal Rules of Civil Procedure are being implemented for those claims. Trial on the remaining claims was bifurcated, and the liability issues were tried beginning on April 9, 1979, and concluding on April 24, 1979.

## FINDINGS OF FACT

### A. Background

1. Defendant DEA is the agency of the Department of Justice responsible for the enforcement of federal criminal laws concerning the illegal sale, distribution, and use of drugs, and the regulation of the legal trade in controlled drugs. The history and structure of DEA may be summarized as follows:

a. Prior to 1968, the enforcement of Federal criminal laws against traffic in illegal controlled substances and the diversion of legally produced controlled substances to the illicit market was the task of the Federal Bureau of Narcotics (FBN) in the Department of Treasury and the Bureau of Drug Abuse Control (BDAC) in the Department of Health, Education, and Welfare. In 1968 the Bureau of Narcotics and Dangerous Drugs (BNDD) was formed and placed in the Department of Justice. The creation of the BNDD was, in effect, a merger of the FBN and BDAC.

b. In 1973 the BNDD was abolished, and its functions, manpower, and budget were transferred to the newly created DEA. From its inception until August 1, 1977, DEA had 13 domestic and six foreign regional offices. On August 1, 1977, one domestic and two foreign offices were abolished. On October 1, 1978, the number of domestic offices was reduced from twelve to five.

c. Criminal investigators in DEA are known as "special agents." They conduct surveillance of suspected narcotics dealers and do related undercover work; transact "buys" of illegal drugs as evidence for prosecution; develop cases for prosecution by United States Attorneys and supervise the work of other special agents. As of October 21, 1978, DEA employed approximately 1,967 special agents, of whom 138 (7%) were Black.

d. DEA has one Administrator, one Deputy Administrator, and seven Assistant Administrators based at Headquarters. These are supergrade positions.

e. The highest official in each DEA region is the Regional Director (RD), which is a GS–17 position. Each region has a regional office headed by the RD, and one or more district and resident offices. Each district office is headed by a Special Agent-in-Charge (SAIC) and each resident office is headed by a Resident Agent-in-Charge (RAIC). SAIC's are GS–14, GS–15, and GS–16 positions. RAIC's are GS–13 and GS–14 positions.

f. In the field offices, most agents are assigned to operating groups of approximately fourteen persons. Most groups are designated as enforcement groups, but some, such as intelligence and conspiracy groups, are assigned specific kinds of work. Each group is headed by a supervisor. The Group Supervisor supervises the day-to-day work of group members, evaluates the members' performance once a year, and has authority to recommend them for promotions, awards, and special training. Group Supervisors are GS–14 positions. Non-supervisory special agents positions are at the GS–7 to GS–13 levels.

g. The minimum requirements for a GS–7 entry level investigative position include three years of general and one year of specialized experience. For a GS–9 entry level investigative position, three years of general and two years of specialized experience are required. The general experience must have involved progressively responsible experience which has required (1) ability to work or deal effectively with individuals or groups, (2) skill in assembling and collecting pertinent facts, (3) ability to prepare clear and concise reports, and (4) ability and

willingness to accept responsibility. Successful completion of one year of college credit may be substituted for nine months of general experience; successful completion of a four year college degree program may be substituted for the three year general experience requirement. The specialized experience must have involved progressively responsible experience which demonstrated (1) initiative, ingenuity, resourcefulness, and judgment required to collect, assemble, and develop facts, (2) ability to think logically and arrive at sound conclusions, (3) skill in the writing and presentation of investigative findings, and (4) tact, discretion, and capacity for obtaining the cooperation and confidence of others. For the criminal investigator or special agent positions, an applicant must have at least one year specialized experience in criminal investigations or comparable experience.

h. DEA can hire an applicant who meets the GS–9 or above minimum requirements at the GS–7 level. Prior to 1978, the decision whether to hire an applicant for special agent above the GS–7 level was made by the RD in the region where the applicant applied. In 1978 hiring authority was transferred to Headquarters; consequently, initial grade assignments for post 1978 applicants are made there.

i. DEA has the authority to make 154 appointments for the special agent position under Civil Service Regulation 213.2110(c) (Schedule A authority). These appointments are conditional; and applicant becomes "excepted" upon satisfactory completion of a one year trial period. Schedule A authority was created to recruit persons with unique combinations of background (e. g. race and ethnicity) and skills (e. g. knowledge of a particular occupation such as pilot, seaman, or musician). While the selection process for Schedule A employees is the same as that for other agents, those employees do not have appeal rights to the Civil Service Commission and cannot be appointed to supervisory positions. A Schedule A employee can, however, convert to regular Civil Service upon certification by the Civil Service Commission. To become certified, the Schedule A employee must pass one of two examinations.

2. Special agents carry out the enforcement activities of the DEA. These activities range from administrative and supervisory duties to the duties of the "street agent." A street agent's duties range from conducting surveillance of suspected narcotics dealers and doing related undercover work to developing cases for prosecution by United States Attorneys. The work procedures of special agents may be summarized as follows:

a. Race and ethnicity influence the location of the assignment of an agent. All other factors being equal, DEA will send a Spanish speaking agent for work in Mexico and a Black agent for work in Detroit (where the majority of violators are Black).

b. This relation of race to location has not resulted in heavy concentration by race in particular areas. The most recent study found that the New York region has 9% Black agents in its workforce; the Miami region has 12% Black agents; Black agents comprise 7% of DEA's special agent workforce.

c. DEA's enforcement focus has changed substantially in the past several years. The agency is now aiming its efforts at network elimination rather than individual elimination. With this change of focus there has been a corresponding reduction in the amount of time agents spend working undercover on the streets.

d. While special agents work in groups, the group supervisor does not always make work assignments. Junior agents receive more supervision than senior agents and, accordingly, have less control over cases. Undercover work is both assigned to agents and developed by agents on their own initiative.

e. While it is difficult to ascertain exactly how much time is spent by each agent performing undercover work, DEA has a form on which estimated undercover time is placed. Form 371 is not highly probative because the form does not define undercover work, and there is no requirement that the form, which is filled in by the supervi-

sor, be verified. Nevertheless, Form 371 provides the Court with objective evidence indicating how much time each agent spends undercover.

f. Because DEA has chosen to infiltrate drug networks primarily from the bottom up, and because DEA assumes that race and ethnic homogeneity are extremely helpful for this type of infiltration, Black agents perform a greater degree of undercover work than white agents.

3. Special agent promotions from GS–7 to GS–9, GS–9 to GS–11, and GS–11 to GS–12 are non-competitive. To receive such a promotion, an agent must serve one year in grade, be recommended by his group supervisor, receive concurrence in this recommendation by a second level supervisor, and have the recommendation approved by the Regional Director. Prior to October 1, 1978, promotions from GS–12 to non-supervisory GS–13 positions were made on a regionally competitive basis. To receive such a promotion, an agent was normally required to serve at least two years in grade, be placed on a best qualified list by a regional career board, and be selected by the regional director. Since 1978, those promotions are considered by the Headquarters GS–13 promotion board.

4. Promotions from GS–13 to GS–14, from GS–14 to GS–15, and, since October 1, 1978, from GS–12 to GS–13 are competitive agency-wide. All Headquarters and overseas positions are likewise competitive agency-wide. To receive such a promotion or assignment, an agent must satisfy the minimum in-grade requirement, be placed on the best qualified list by the appropriate rating and ranking board, and be selected by the appropriate selecting official. In making its determinations, the rating and ranking boards rely primarily on the agent's most recent performance appraisal, information on disciplinary action within the last two years, and the applicant's application and profile sheet. Agents are then ranked numerically. When the numerical rating system was first implemented in 1976, point values were identified and assigned as follows: length of experience (20), breadth of experience (30), performance evaluation (40) and education and training (10). DEA modified this rating system in 1977 by replacing length of experience with diversity of experience. In 1978 the rating system was again modified, and 45 points were assigned to breadth of experience, 45 points for performance evaluation, and 10 points for training. Breadth of experience contains the following subcategories: supervisory experience (8), complex investigation experience (6), internal security experience (7) diverse domestic (6) and foreign (7) experience, and special skills (4). Performance evaluation contains the following subcategories: most recent annual rating (25) supervisor's comments (15) and awards (5). Rating and ranking boards are not provided any guidance for assigning points; attaching point value to an agent's application is done on the basis of judgment. Appointments at the GS–16 level and above are made at the discretion of the Administrator.

5. DEA also has procedures for dealing with allegations of agent misconduct. The DEA investigates such allegations if they are made against agents by bona fide individuals and the alleged violation falls within the jurisdiction of the DEA. After a thorough investigation, the investigating official decides whether a disciplinary action should be brought. In 1977, about 30% of the allegations giving rise to an investigation came from within the DEA; 70% came from other sources. In 1977 and 1978 between 60% and 70% of the allegations have proven to be unfounded.

### B. Statistical Evidence

6. Plaintiffs produced statistical evidence and testimony of Drs. Barbara Bergmann and Mahlon Straszheim, two economists from the University of Maryland. Both have Ph.D's in Economics and have done scholarly work in the field of discrimination. Plaintiffs also introduced the testimony of James Outtz, Ph.D., an industrial psychologist who is an expert in the employment discrimination area. Defendants produced the statistical evidence and testimony of Drs. Martin Kurke, J. Wanzer

Drane, and B. C. Spradlin. Dr. Kurke has a Ph.D in engineering psychology and social psychology. Drs. Drane and Sprandlin are experts in statistics. All of the above individuals are experts within the meaning of Article VII of the Federal Rules of Evidence; the evidence presented by them is not diminuted due to defects in their expertise.

7. The average salary of Black DEA agents has been and is substantially below that of white agents. As of January 1, 1975, Blacks earned on average $17,637, while whites earned $20,604. As of October 1978 Blacks earned on average $26,232, while Whites earned $29,490. The differentials are $2,967 and $3,258 respectively. The statistical evidence presented by Plaintiffs regarding the disparity in salaries may be summarized as follows:

a. Plaintiffs' experts ran regression analyses to test the legitimacy of the salary disparity. The variables in the analyses, entered simultaneously, were (a) years of federal experience, (b) years of nonfederal experience, (c) level of educational attainment, and (d) race. These are the only variables contained in the JUNIPER system (JUNIPER is the Department of Justice's computerized data system).

b. The results of these analyses are, with respect to race:

| DATE | RACE COEFFICIENT | T.–RATIO |
|---|---|---|
| 1/1/75 | – $1,628 | 4.65 |
| 1/1/76 | – $1,744 | 5.37 |
| 1/1/77 | – $1,706 | 5.15 |
| 1/1/78 | – $1,934 | 5.15 |
| 10/1/78 | – $1,877 | 4.50 |

c. The race coefficient is the amount Black agents were paid less than white agents, on average, after differences in education and experience (the JUNIPER variables) were equalized. The t-ratio measures the statistical significance of the study. The t-ratios indicate that the probability of any of the above disparities happening by chance is less than one in a thousand; thus, the study is statistically significant at the .001 level.

d. Because Title VII is applicable to the DEA only for post-1972 discrimination, Plaintiff performed regression analyses for new hires after 1972. The results of these analyses are, with respect to race:

| DATE | RACE COEFFICIENT | T.–RATIO |
|---|---|---|
| 1/1/75 | – $ 378 | .84 |
| 1/1/76 | – $1,864 | 2.54 |
| 1/1/77 | – $1,119 | 3.18 |
| 1/1/78 | – $ 886 | 2.07 |
| 10/1/78 | – $1,026 | 2.30 |

The salary differentials are statistically significant at or below the .05 level for every year save 1975.

e. The statistics in subparagraph (d) tend to downplay the effects of discrimination at DEA because almost half the agents in the 1975 analyses were hired in 1974, and the most serious promotional problems are encountered in the middle and upper grades.

f. Defendants claim that Plaintiffs' statistical evidence is flawed because the studies failed to include certain variables that would necessarily affect the analyses' outcome, to wit: (a) pre-1972 discrimination, (b) inflation, and (c) DEA's promotion criteria. If any or all of these factors has a high corrolation to post 1972 race discrimination,[1] and should have been included in the analyses,[2] their omission would flaw the studies.

g. It has been neither admitted nor proven that Defendants discriminated against Black special agents prior to 1972.

1. For example, there is a high correlation between Smokey the Bear advertisements in the New York City subways and the lack of forest fires in New York City. A regression analysis depicting this high correlation would be flawed if it excluded the fact that there are no forests in New York City, a variable that has a high correlation to forest fires.

2. Plaintiffs cannot be expected to include all possible variables in their regression analyses. Rather, only those variables that are both objective in nature and quantifiable need be included. Whether Plaintiff should have attempted to qualify and include pre-1972 discrimination, in light of the absence of an admission by Defendants that such discrimination took place, is a legal question dealt with *infra*.

h. Qualifying the effect of pre-1972 discrimination for the purposes of a regression analysis is extremely difficult, and Defendants have not demonstrated any plausible way of differentiating between post 1972 discrimination and the effects of pre-1972 discrimination. It is clear, however, that pre-1972 discrimination might affect the subparagraph (b) statistics.[3]

i. The statistics in subparagraph (d) reflect that while pre-1972 discrimination may have affected the statistics in subparagraph (b), post 1972 discrimination largely contributed to those statistics.

j. Inflation could have a multiplier effect on Plaintiffs' statistics. Unless pre-1972 discrimination is assumed, however, the effects of inflation would be borne equally by all DEA agents, and inflation would be irrelevant to Plaintiffs' regression analyses.

k. Ordinarily, an employer's promotion criteria should be considered in regression analyses used to explain disparities in salary. Unless those promotion criteria are objective and quantifiable (such as experience and education) they cannot and should not be factored into regression analyses. With the exception of the promotion criteria included in Plaintiffs' analyses, DEA's promotion standards are subjective in nature. As such, they were correctly omitted from Plaintiffs' studies.

l. Defendants also contend that Plaintiffs' regression analyses do not explain the salary disparities, and this is borne out by the "$R^2$" values given those analyses. The analyses in subparagraph (b) have "$R^2$" values of .42 to .52. The studies in subparagraph (d) have $R^2$ values of .21 to .37.

m. $R^2$ values quantify the proportion of the total variance in the dependent variable that is associated with variations in the independent variable. They thus indicate the relative importance of the race variable in Plaintiffs' studies. According to the $R^2$ values attached to the two studies, race accounted for 42% to 52% of the salary disparities in the subparagraph (b) analyses, and for 21% to 37% of the salary disparities in the subparagraph (d) studies.

n. $R^2$ values do not replace levels of statistical significance. In the instant case, they merely indicate that other variables may also be important in explaining the salary disparities. The $R^2$ values of the analyses are not so low as to adversely affect the veracity of Plaintiffs' studies.

8. Defendants presented a statistical study, called "cohort analysis" to rebut Plaintiffs' allegations of salary disparity. Cohort analysis first divides the workforce into groups of agents based on the year said agents joined the DEA and the GS grade they received upon entry. Average salaries of Black and White agents were then compared within each group. No comparison was made between agents whose grade-at-entry or entry year were different. The results of this analysis may be summarized as follows:

a. Statistical tests were performed on each of the 15 groups of cohorts. For four of these groups, Defendants found a statistically significant level of discrimination. Those four groups were then broken down into groups of subcohorts on the basis of entry grade and step and by status as a new hire or transfer. Defendants found a statistically significant level of discrimination in two of the four subcohort groups. Defendants reviewed the files of the fourteen Black agents in the two groups, finding that three of those agents had been improperly classified. DEA upgraded those agents. After the upgrading, the salary disparities were no longer found to be statistically significant.

---

3. Depending on DEA's response to perceived pre-1972 discrimination, said discrimination might have three possible effects on the subparagraph (b) statistics, namely (1) the showing of post-1972 discrimination could be artificially accentuated because it would include pre-1972 discrimination, (2) the showing could be attenuated by any affirmative action taken by DEA to rectify pre-1972 discrimination, and (3) the showing might actually downplay post-1972 discrimination because any affirmative action by DEA was overresponsive to the pre-1972 discrimination. No evidence was presented by Defendants indicating that one of the three possibilities was more probable than any of the others.

b. Cohort analysis is an untried method of statistical study, unsupported in any published statistical work or judicial decision.

c. The rationale for the use of cohort analysis is that it purportedly accounts for pre-1972 discrimination and inflation. Defendants failed to show how cohort analysis accounted for these variables. Indeed, they failed to prove the existence of pre-1972 discrimination.

d. Cohort analysis cannot and does not take into account the agents' individual qualifications (such as education and experience). Agents who entered at the same grade and in the same year were treated as if they had equal qualifications. This undermines the probative value of Defendants' study.

e. An agency's grade at entry does not figure into the promotion process. Moreover, all will be seen *infra*, Plaintiffs' statistical evidence indicates DEA discriminated against agents in ascertaining the initial grade at entry. Inclusion of grade at entry as a variable in the cohort analysis significantly undermines the study's probative value.

f. The 1973 entry year group (80% of all agents) contains agents who were BNDD agents prior to 1973 and remained DEA agents after 1973. Those agents had different starting years and grades. Use of these agents as one cohort group is inconsistent with the theory underlying cohort analysis.

g. Only two cohorts groups (1973 and 1974) contained more than 31 agents. Comparison of the October 1978 salaries of the 1973 group reflects a disparity that is statistically significant at the .01 level; comparison of the October 1978 salaries of the 1974 group reflects a disparity that is statistically significant at the .002 level.

h. The size of a sample affects the statistical significance of a study. The smaller the sample is, the greater the disparity has to be before it can be considered statistically significant. The disparities in the remaining groups are statistically insignificant primarily because of the small sample size.

i. Cohort analysis did not account for agents who left the DEA prior to October 1978. Moreover, 163 agents (27 of whom are Black) were inexplicably omitted from the study.

j. As the foregoing facts indicate, the cohort analysis is too flawed to be accorded significant probative value.

9. Plaintiffs performed regression analyses to test the legitimacy of disparities in grade at entry, using only those variables in the Department of Justice's JUNIPER system. The results of these analyses may be summarized as follows:

a. Blacks were 16% less likely than whites to receive GS–9 (as opposed to GS–7) positions. This is statistically significant at the .05 level. Blacks have been less likely than whites to be hired above the GS–9 level, and this is statistically significant at the .05 level. For new hires (post 1972) Blacks were 12% less likely than whites to be hired at GS–9, as opposed to GS–7, and this is statistically significant at the .01 level.

b. Defendants offered four criticisms of Plaintiffs' study, to wit: (1) the regressions used a dichotomous dependent, (2) Plaintiffs' expert did not know the job qualifications for the various positions, (3) Plaintiffs used an incomplete sample for the analyses that contained those hired prior to 1972, and (4) the analyses that included those hired prior to 1972 also included transfers.

c. Defendants' criticism of the use of a dichotomous dependent is without merit. Use of a dichotomous dependent is appropriate where only two outcomes are possible. Since only two outcomes were possible (will the agent be hired at GS–7 or GS–9) its use was appropriate in the instant context.

d. DEA's job qualifications have been delineated *supra* at 3. With the exception of education and experience, quantifying the degree that an individual has achieved these qualifications is impossible because the qualifications are all subjective in nature. Plaintiffs' experts' unfamiliarity with the qualifications is irrelevant because

their lack of knowledge did not affect the results of the analyses.

e. Defendants' claim that the analyses dealing with those hired prior to 1972 is flawed because only 483 agents were included in the study. Defendants, however, do not attack the randomness of Plaintiffs' sample. It is evident that the size of the sample used in a regression analysis affects the analysis' statistical significance. Since these analyses were statistically significant, Defendants' contentions are unwarranted.

f. Finally, Defendants claim that the probative value of these analyses is undermined because transferees were included. Transferees, regardless of their qualifications, receive as their entry grade the grade they had at other agencies. Since the probability of the transferee's appointment grade is 100%, a probability study (such as the regression analyses in the instant case) is flawed by their inclusion.[4] The degree that this flaw impacts on the probative value of the studies is not great, however, because the most telling study involves only new hires. Transferees were not included in this analysis, and it is statistically significant at the .01 level.

10. Defendants presented statistical evidence to rebut claims of discrimination in grade at entry. Defendants evidence was a chi-square test, which found that discrimination in grade at entry was statistically significant at the .117 level. Thus, Defendants' expert concluded that there was no discrimination in grade at entry. A chi-squared test is two tailed rather than one tailed. It therefore addresses the question "What is the likelihood of finding a disparity which favors Black *or* White hires," rather that the *one* tailed question "What is the

likelihood of finding a disparity favoring White hires?" Plaintiffs analyses are one tailed. In discrimination cases of this kind, where only a positive disparity is of interest, the one tailed test is superior.[5] This Court must conclude that the statistical evidence supports Plaintiffs' contention that new hires were discriminated against in grade at entry.

11. Plaintiffs presented evidence indicating that a higher portion of Blacks than whites have been hired pursuant to Schedule A. The Defendants presented evidence explaining that this disparity was a result of DEA's use of Schedule A for conditional employment, and that the disparity has decreased over the years because DEA has changed its policy. Plaintiffs made no showing that hiring pursuant to Schedule A was discriminatory, nor did they show that any discrimination took place when a Schedule A agent decided to convert to Civil Service appointment.

12. Plaintiffs presented statistical evidence supporting their claim that Blacks were discriminated against in work assignments. Plaintiffs rely on DEA Form 371 for the data underlying their analyses. While Form 371 is flawed, *see* pages 694–695, *supra*, it is the sole source available for the objective data necessary for the statistical studies. Form 371 lists 16 job activities and indicates the percentage of each agent's time spent performing those activities. The information was stratified according to race and grade, and the mean percentage of time that agents devoted to each of those tasks became the subject of regression analyses. The results of these studies indicate that Black agents performed different functions at DEA than did white agents.[6]

---

4. It is unclear what effect the inclusion of transferees had on Plaintiffs' analyses. If the other government agencies did not discriminate in hiring, the exclusion of transferees might serve to increase the probabilities found by Plaintiffs. If the other government agencies discriminated more than Defendants did, the converse would be true. Assuming an equal degree of discrimination, the exclusion of transferees would probably not alter the results of Plaintiffs' analyses.

5. All other factors being equal, a one tailed test will have a level of statistical significance half that of a two tailed test. This may explain, for the most part, the differences in statistical significance between Plaintiffs' and Defendants' studies.

6. Plaintiffs' studies indicate a disparity in time spent performing

As will be seen *infra*, this had an adverse effect on promotions of Black special agents.

13. Defendants have not presented statistical evidence to rebut Plaintiffs' claims of discrimination in work assignment. Rather, Defendants contend that Plaintiffs' statistics are not probative because Plaintiffs' experts did not know who performed the work assignments or whether those assignments were carried out. Defendants' criticisms do not attenuate the value of Plaintiffs' statistics. This Court need not evaluate the knowledge of Plaintiffs' expert. Rather, it must scrutinize the regression analyses themselves. The analyses are based on an obviously unbiased source (Defendants' Form 371), and it is clear that those forms primarily reflect assignments made by supervisors.

14. Plaintiffs' claim that Black agents have been discriminated against in supervisory evaluations. Plaintiffs' allegation is borne out upon scrutiny of the Form 371, which contains the evaluations. Plaintiffs' regression analyses indicate that, for agents at the GS–11 level and above, the differences in supervisory evaluations were statistically significant at between .05 and .10. Defendants presented no evidence rebutting Plaintiffs' findings; indeed, Defendants have not criticized any aspect of these analyses.

15. Plaintiffs allege that DEA has discriminated against them in the imposition of discipline. The imposition of discipline at DEA is left to the discretion of supervisors; there is little guidance given at DEA in deciding when to take disciplinary action or what standards to impose, and there are no guidelines for the selection of a penalty. Plaintiffs performed regression analyses, based on statistics furnished by Defendants' experts, on both the incidence of disciplinary action and the severity of the reprimand. These analyses may be summarized as follows:

a. While Blacks constitute 6.7% of the special agent workforce, 13.3% of the disciplinary actions were brought against Black agents. This disparity is statistically significant at the .0001 level. On a year-to-year basis, the disparity is statistically significant at .01 or .02.[7]

b. The three severest punishments are removal, demotion, and suspension. Blacks were 25% of those disciplined by removal or demotion, although they were only 13.3% of those disciplined. This difference is statistically significant at the .10 level. Blacks were 18.7% of those disciplined by removal, demotion, or suspension. This difference is statistically significant at the .05 level.

c. Defendants' claim that these analyses are flawed because the majority of all disciplinary actions result from complaints outside the DEA. The contention is without merit. The issue presented here is not whether the initiation of the disciplinary process is *per se* discriminatory. Rather, the issue is whether the system, as effectuated, discriminates against Black agents. DEA chose to pursue all complaints against agents made by *bona fide* individuals, and DEA determined which complaints warranted disciplinary action. Plaintiffs' statistics, which are unrefuted, indicate that there is only a one in ten thousand chance that the degree to which Black agents are

a. undercover work

| | GS–9 and below | GS–11 | GS–12 | GS–13 |
|---|---|---|---|---|
| Blacks | 16.9% | 18.3% | 16.9% | 8.7% |
| Whites | 12.8% | 10.8% | 7.6% | 2.8% |
| difference | 33 % | 66 % | 54 % | 300 % |
| stat. sig. | .10 | .05 | .05 | .05 |

b. undercover and street work

| | GS–9 and below | GS–11 | GS–12 | GS–13 |
|---|---|---|---|---|
| Blacks | 52% | 51.3% | 48.1% | 28.7% |
| Whites | 49% | 38.8% | 33.7% | 20.1% |
| difference | 6% | 32 % | 42 % | 42 % |
| stat. sig. | none | .05 | | .05 (GS–12 and GS–13 combined) |

c. specialized duties

| | | | | |
|---|---|---|---|---|
| Blacks | 12.5% | 14.8% | 18.3% | 15.8% |
| Whites | 15.3% | 20.1% | 27.3% | 26.4% |
| difference | 22 % | 36 % | 49 % | 67 % |
| stat. sig. | none | .05 | | .05 (GS–12 and GS–13 combined) |

d. supervisory duties

| | |
|---|---|
| Blacks | 8% |
| Whites | 16% |
| difference | 200% |
| stat. sig. | .05 |

7. The difference in statistical significance is due to the difference in sample size between a

subject to disciplinary action happened randomly.

d. Defendants also claim that Messrs. Segar and Davis were included twice in Plaintiffs' severity study. Defendants then used the a chi-square test,[8] and determined that the statistical significance of any disparity in the severity of disciplinary action was between .10 and .20.[9] Defendants' expert omitted all cases of alleged multiple offenses, however, where most of the more serious sanctions were imposed. While Defendants' statistical evidence is thus flawed, it still serves to support Plaintiffs' contention that Blacks are disciplined more often and more severely than Whites.

16. Plaintiffs' experts conducted a study of the incidence of promotions, defined as the proportion of agents who began a calendar year at a given grade who were promoted during the next year to the next highest grade. The study covered all promotions for years 1975 through 1978, and the results may be summarized as follows:

a. Promotions were almost automatic from GS-7 to GS-9 and from GS-9 to GS-11. The promotion rate from GS-11 to GS-12 was 70% for Blacks and 82% for whites. This is statistically significant at the .01 level. The promotion rate for GS-12 to GS-13 was 6% for Blacks and 8% for whites. This difference is not statistically significant. The promotion rate from GS-13 to GS-14 was 3% for Blacks and 7% for whites. This is statistically significant at the .10 level. Differences in promotions were statistically insignificant for GS-14 to GS-15 and GS-15 through GS-18.

b. Most of the GS-11 to GS-12 promotions are noncompetitive, and promotion is based on the recommendation of the agent's supervisor. GS-11 is the first grade where supervisors' ratings for Black agents were substantially lower than ratings for White agents.

c. Defendants attack Plaintiffs' study on three grounds, *viz.* (1) only from GS-11 to GS-12 was the study statistically significant, (2) Plaintiffs did not ascertain what agents applied for promotions, and (3) the regression analyses did not consider the quality of agents' past performance.

d. Plaintiffs' experts consider a .10 level (10% possibility of chance) to be statistically significant. Defendants experts stated that anything above the .05 level was statistically insignificant. The probative value of a study is affected by that study's statistical significance. Thus, this Court accords minimal value to Plaintiffs' promotions analysis for promotions from GS-13 to GS-14.

e. Promotions from GS-11 to GS-12 are primarily noncompetitive. Applications for those positions are therefore not required. For competitive positions, Plaintiffs presented evidence, which was undisputed, that Black and white agents applied for positions in equal numbers. Defendants' second contention is therefore without merit.

f. Defendants' allegation that Plaintiffs' studies did not consider work qualifications is unfounded. Their analyses contained all the data in the JUNIPER system. All other promotions criteria is subjective, and therefore was correctly excluded from Plaintiffs' analyses. A clear disparity in promotions from GS-11 to GS-12 exists at DEA.

g. Defendants' expert performed an overall incidence of promotions study, and found no disparate impact. Defendants' study included promotions data from all grades. Thus, it included promotions from GS-7 to GS-9 and from GS-9 to GS-11, which are granted almost as a matter of course. Defendants' study is therefore not probative.

17. Plaintiffs also presented statistical evidence to prove that Blacks were discrimi-

---

year-to-year analysis and the total amount of disciplinary actions brought after 1972.

8. As was noted in paragraph 12, *supra*, a chi-square test is inferior to Plaintiffs' one-tailed test.

9. *See* footnote 5, *supra*.

nated against in Career Board appointments. Their study included all vacancy announcements that were filled competitively by the Career Board, excluding those filled by lateral transfer or vacancy. Blacks and whites applied in equal numbers for Career Board appointments, and whites received a greater number of appointments. Plaintiffs' study is not probative, however, because it fails to exclude job positions for which no Blacks applied. If those positions are excluded, any disparity shown is statistically insignificant.

### C. Non-Statistical Evidence

*Initial Grade Assignments and Schedule A Appointments*

18. In addition to the statistical evidence from both Plaintiffs' and Defendants' expert witnesses there was specific testimony relating to the allegations of Lionel Stewart, John Sutton, and Samuel Blackburn regarding the grade at which they were hired;

a. Lionel Stewart, who came to DEA from a responsible position in military drug enforcement and who had extensive experience in drug enforcement, entered DEA at a Schedule A GS–9 and contended that at the same time two comparably qualified Whites entered at GS–11. Significantly he did not have Civil Service status at the time he applied to DEA and thus could not be equated with the two agents who came to DEA, from AFT and ONI presumably with Civil Service status.

b. John Sutton entered DEA as a GS–7. He contended that at the time he joined BNDD, he met the minimum requirements for a GS–9 position. He considered requesting that he be hired at the GS–9 level, but did not do so because an agent named Drueger instructed him to put down the lowest level that he would accept as the GS–7 level. Sutton claimed that other agents who were White were hired above the GS–7 level. Although he did not have a mid-level rating, he testified that he knew that a number of the other persons hired at the GS–9 level also were not rated at mid-level. No evidence was presented during trial as to the previous experience or qualifications of the other individuals whom he alleged were hired at the GS–9 level. Sutton noted that upon being hired he discussed the possibility of being promoted to the GS–9 level with the Personnel Director, Mr. Benston. According to Sutton, Benston instructed him to take the mid-level examination, and if he passed he would be qualified for GS–9 and would be promoted after being on the job six months. Sutton took the mid-level but was not promoted after six months. He was promoted to GS–9 approximately one year after coming on the job. Sutton recalled that the other agents who were hired at GS–7 when he was were promoted to GS–9 more quickly. He named one agent who was promoted from GS–7 to GS–8 in six months, but again there was no evidence as to the qualifications of that agent. Defendants' Sutton Exhibit A was a memorandum written in October, 1969, by Jessie M. Gallegos, then DEA's Recruiting and Placement Officer. Also on the memorandum was a handwritten note signed by Mr. Benston. The memorandum was prepared by Mr. Gallegos and signed by Mr. Benston during the time that Sutton was at basic training school. The memorandum dealt with the issue of whether Sutton qualified for a GS–9 position. According to Mr. Gallegos, in order to qualify for the GS–9, Sutton would have had to have spent at least 50% of his time at the Compton Police Department in criminal investigations requiring the use of investigative methods and techniques such as surveillance and assuming an undercover role. Sutton felt that, based upon his experience working with the Compton Police Department, he met this requirement. He indicated that Mr. Benston told him he qualified for a GS–9 position. The memorandum, however, reflects that Benston discussed the possibility of eligibility for a GS–9 with Sutton, that Sutton told him that he believed he was qualified and that Benston had advised Sutton to take the mid-level. Benston's contemporaneous memorandum did not imply that Benston stated that Sutton was qualified for a GS–9 position. Sutton admitted that it was Mr. Benston who

brought the question of his qualifications for GS–9 to his attention, and not vice versa. Sutton conceded that he was aware that his promotion to GS–9 was contingent upon doing well on the mid-level exam, and that the Civil Service Commission had to be convinced that he met the requirements. He noted that Mr. Benston did not give him any indication that there would be a problem, although Benston did not tell him that he could make him a GS–9. In addition to the contemporaneous memorandum (Defendants' Sutton Exhibit A) defendants offered the testimony of Joseph Krueger. Mr. Krueger denied having told Sutton to accept a GS–7 position even though he was qualified for a GS–9. It was Krueger's recollection that Sutton's prior experience did not qualify him for the GS–9 position. Consistent with this, Sutton testified that he believed that he did not work undercover on any drug violations while employed by the Compton Police Department.

c. Samuel Blackburn was hired by DEA under Schedule A at the GS–9, step 1, level in April, 1974. Before joining DEA he was employed with the Metropolitan Police Department in Washington, D.C., where his duties included undercover work and narcotics work. He claimed that he was subject to discrimination because DEA tried to hire him at the GS–7, step 1, even when he believed himself qualified for entry at the GS–9, step 1, level. According to Blackburn, sometime between his panel interview and the job offer, DEA's Personnel Director, Mr. Ballard, directed him to submit his qualifications to the Civil Service Commission so that he would be able to enter on the mid-level. Blackburn testified that he applied to the Civil Service Commission through the mid-level examination and received what he thought to be a rating which qualified him to enter as an agent at the GS–9, step 1, level. After receiving an offer of employment at the GS–7, step 1, level, dated April 24, 1974, he contacted the Baltimore Regional Office and informed them that he had applied for a mid-level status and that he had received a communication from the Civil Service Commission noting his GS–9, step 1, rating. Blackburn

stated that a Mr. Mitch, with whom he spoke, became rude and told him to take the job as a GS–7, step 1, or to forget about it. Blackburn subsequently spoke to the personnel office at Headquarters and was informed that DEA would offer him a position at the GS–9, step 1, level. Plaintiffs' Exhibit 33 confirmed that, on April 25, 1974, Blackburn was offered a position at the GS–9, step 1, level. Blackburn admitted that upon receipt of the April 24, 1974, letter, he checked the box indicating that he accepted DEA's offer of employment at the GS–7, step 1, level, and that he signed the letter and dated it April 24, 1974. Blackburn noted that he received a letter from Mr. Ballard on April 25, 1974, stating that DEA would offer him a position at the GS–9, step 1, level and that, therefore, it took only one day to straighten out the confusion between his entry at grade 7 versus grade 9.

19. The testimony regarding Schedule A Appointments may be summarized as follows.

a. Blackburn also contended that he was discriminated against in being hired under Schedule A as opposed to career conditional. Blackburn testified that he believed the letter of April 25, 1974, from Mr. Ballard meant that he was on the Civil Service register and that DEA had received his mid-level qualification rating. Blackburn believed that his Schedule A appointment was temporary and that he would be converted to career conditional status as soon as DEA could take his name from the Civil Service register. Blackburn testified that he was led to believe that this would take only one to three weeks. Blackburn contended that he was misled as to the nature of Schedule A status. He testified that when he was hired under Schedule A, no one at DEA explained the limitations of Schedule A insofar as promotions and job security. Blackburn noted that he was told during his job interview that he would have the same opportunity to progress through DEA as he had with the police department. He subsequently found that Schedule A employees could not hold supervisory positions

nor progress beyond the GS–13 level. Because he was not made aware of these limitations when he was hired, Blackburn felt that DEA had lied to him about his employment opportunity.

b. Blackburn pointed out that he has spoken to other Schedule A agents in New York who were also unaware of the implications of being a Schedule A employee. Blackburn spoke to Mr. Joseph LaRocco, the Personnel Officer in New York, about the details of Schedule A. According to Blackburn, LaRocco told him that in order to be converted he would have to get on the Civil Service register. LaRocco told him he would have to do this by reapplying through the mid-level exam, but that the New York register had been closed for a number of years and there was nothing he could do until it reopened. Blackburn subsequently filed a complaint of discrimination against DEA regarding the Schedule A matter. His complaint was denied by DEA's EEO Office and then subsequently denied by the Department of Justice.

c. Blackburn further testified that his understanding that having a mid-level rating automatically qualified him for a career conditional position was based on conversations with his friends. He admitted that he accepted DEA's job offer knowing that he was being hired as a Schedule A appointee, and that the letter offering him employment stated that he would be converted to career conditional status when his name could be obtained from the Federal Civil Service register. Blackburn further admitted that he was employed by DEA for three years before he went to Mr. LaRocco to ask about being converted from Schedule A. He noted that LaRocco encouraged him to try to get on the register and that LaRocco wrote to him twice, telling him that the register might be opening and that he should apply to get on. Blackburn also admitted that he was not aware that 23 New York agents were also awaiting conversion and that nine of them were Black, seven Hispanic, and seven were white. Finally, Blackburn conceded that of the 12 persons who were converted at the same time as him, ten were minorities.

d. Defendants called Joseph C. LaRocco, the New York Regional Personnel Officer, who testified that there was nothing in Blackburn's personnel file to indicate that he had any kind of competitive status or Civil Service listing, and that, therefore, Blackburn could only have been hired on Schedule A. LaRocco noted that an explanation of Schedule A is attached to every Personnel Action Form (Form 50) received by the agent. Since Blackburn had received 12 personnel actions up to the time he had the detailed discussion with LaRocco regarding Schedule A in April or May of 1977, Blackburn had had an opportunity to see an explanation of Schedule A at least 12 times. LaRocco further testified that Blackburn's mid-level examination rating in itself did not imply that Blackburn could be hired as a career conditional employee because one must have competitive status or a Civil Service listing to be hired as career conditional. LaRocco testified that Blackburn's name did not appear on the Civil Service certificate until February, 1979, and that Blackburn was converted that same month.

20. Until hiring authority was transferred to Headquarters, the regional directors recommended applicants to Headquarters and also recommended the GS level at which they should be hired. Directives from Headquarters requested the field offices to hire at the GS–7 level if at all possible because of severe budgetary restraints. Additionally, regional directors were limited by the Civil Service qualification requirements. No applicant could be hired at either GS–7 or GS–9 unless the applicant met the Civil Service qualifications for the particular grade level. Applicants on a Civil Service GS–9 certificate could not be hired as a GS–7 unless under Schedule A, and Schedule A was rarely used to hire an applicant already on the Civil Service register.

*Work Assignments*

21. Discretionary assignment decisions made or approved by supervisors largely

influence the kinds and amount of work agents perform. Those assignments decisions, rather than voluntary choices by agents, principally determine the work of the agents. At the office level, Regional Directors, SAICs and RAICs have authority and responsibility to assign agents to groups. At the group level, group supervisors have the authority and responsibility to make individual job assignments for the agents under their direct supervision. Race is considered in the assignment of agents to undercover work. This practice has produced a pattern in which Blacks spend significantly more time in undercover and related work and less in general administrative and supervisory work than Whites and impacts adversely on the ability of Black agents to develop skills in all areas of the job of special agent.

22. The regulation of Black agents to particular types of job assignments is historical with Defendants. A 1971 decision on the complaint of Black agent Benjamin Metz so concluded. That decision further concluded that the failure of responsible agency officials to correct this job assignment problem made them responsible for depriving Black agents of opportunities that were career beneficial. The 1974 Department of Justice report on discrimination at DEA concluded that "minorities are used to a greater extent than non-minorities in undercover work." These earlier practices reflect a persistent agency attitude that overtly regarded Black agents as a different kind of agent from white agents; that the proper role for Blacks is in undercover working for White agents and dealing primarily with Black suspects. Nothing in the nature of the job of a special agent justifies such a differential in work assignments as between White and Black agents.

23. Disproportionate regular or Temporary Duty (TDY) Assignment to undercover work adversely affects Black agents in that undercover work (a) exposes all agents to dangers and hardships, including life threatening situations that are considerably lessened in other work assignments, (b) precludes obtaining the breadth of experience

that is a critical consideration for promotion to supervisory positions, (c) teaches a limited range of skills, and (d) impairs an agent's ability to remain current with necessary administrative duties. Such administrative and supervisory experience as is gained in undercover work cannot be equated in kind or quality with that entailed in other job assignments.

*Supervisory Evaluation and Promotion*

24. All agents are periodically evaluated by their supervisors on a set of designated dimensions designed to reflect job performance. The results are reported on a standard supervisors' evaluation form, DEA Form 371. These evaluation forms are completed at least annually and play an important role in decisions whether to promote an agent. The supervisor completes three portions of the form. In the first part, the supervisor indicates the amount of time the agent had devoted during the year to various agent activities such as informant development, undercover operations, conspiracy investigations, supervisory duties, and giving direction as case agent. In the Evaluation of Performance section of the 371 form, the supervisor gives a general appraisal of the agent's work and evaluates the agent on 16 specific elements of performance. In the third part of the form the supervisor rates the agent's potential. The form directs the supervisor to "appraise the agent's overall growth capacity and evidence of ability to assume greater responsibility IN RELATION TO OTHER AGENTS of his or her grade level." The possible ratings are lower 25 percent, middle 50 percent, and lower 2/3 or upper 1/3 of top 25 percent. The form also provides for the supervisor to rate the agent and make recommendations regarding his further assignments and training.

25. The agent is afforded an opportunity to review and comment on the evaluation in a subsequent part, and is required to sign it. The evaluation form is also reviewed by the second level supervisor. There is a space for him to comment on the relationship between the agent and his supervisor,

the extent to which the agent's performance was directly observed by his supervisor, and the fairness and completeness of the evaluation. He may also make comments on the agent's performance and potential.

26. Employment decisions should be made on the basis of accurate and complete information about the nature of the job involved. Information about the components of a job, and the abilities needed to perform the job successfully, is best obtained through a job analysis. A job analysis is a systematic, detailed study of the content of a job such that one can develop an accurate description of what the job entails, the conditions under which the job is performed, and the knowledge, skills, and abilities needed to perform that job. Its purpose is to develop sufficient information from which one can reach certain conclusions about the job and determine the minimum qualifications that might be needed, the appropriate performance standards that should be set, and the appropriate training program that might be established for the job, and other relevant and important considerations.

27. Before an employer uses a selection procedure, it should determine the validity of the selection procedure by performing a validation study. A job analysis is an essential component of a validation study. A selection measure is valid if it is positively related to job performance. DEA has not validated the use of its supervisors' evaluation form, and has undertaken no job analysis or validation studies. Absent such studies, there is no way to determine whether the supervisors' evaluation form is at all related to job performance.

28. DEA provides its supervisors with no written instructions on how to evaluate an agent's performance in each of the rating categories on the form. Although at Supervisory Training School a few hours of instruction are offered on how to complete the supervisors' evaluation form, the Personnel Office conducts no follow-up studies to ensure that supervisors are interpreting the categories and evaluating agents' performance consistently. When untutored supervisors are confronted with rating categories that are not tied to specific behaviors, they are, as Outtz testified, "likely to err in terms of making judgments about performance" in a racially discriminatory manner. Use of an evaluation system such as DEA's, where almost all group supervisors are White, is very likely to result in Black agents receiving lower ratings than their White counterparts.

29. The testimony of Black special agents confirms Plaintiffs' statistical proof that DEA's supervisors' evaluation form has an adverse impact on Black special agents. For example, in 1976, Special Agent Blackburn's *Black* group supervisor rated him in the upper ⅓ of the top 25 percent in the evaluation of potential category. In the specific performance categories, Agent Blackburn was rated high in Initiative, Ambition, Judgment, Forcefulness, Cooperation, and Competence. In 1977 and 1978, on the other hand, Agent Blackburn was evaluated by his *White* group supervisor, Joseph C. Braddock, and his ratings were lower in almost all areas. Indeed, in 1977 he was rated very low in the valuation of potential category (middle 50%). Moreover, he was criticized for being too ambitious, too rash in judgment, and too uncooperative with other—presumably White—agents. Black agents who do not conform to the expectations White agents and especially their White group supervisors have about them, are criticized for being too aggressive and too abrasive.

30. Supervisors tend to rate "a higher percentage and certainly more than half" of the agents in the top 25 percent in the evaluation of potential category. As a result of this "rating inflation," for all practical purposes an agent must be rated in the top 25 percent to be seriously considered for a promotion to a GS–13 or above position.

31. Because Black agents are rated systematically lower than the White agents in their groups, they complain to their group supervisors more often about their evaluations. This contributes to an unhealthy working situation in which Blacks tend to

be regarded by their supervisors as too sensitive and too aggressive.

32. Group supervisors are in a position to affect substantially the kinds of work assignments and training opportunities that are available to special agents in their group. These supervisors will naturally be influenced in these matters by their evaluations of their agents' performance and potential. Because Black agents systematically have lower evaluations, the rewarding work and training assignments tend not to go to them.

33. Although Black agents usually are allowed to attend some training classes available to DEA agents, they must actively seek them out and demand that they be sent in order to receive this training. White agents, on the other hand, are more likely to be selected by their group supervisors to attend without having to indicate any interest in the class. Training has an impact on an agent's career development. The fact that Black agents are systematically rated lower than Whites directly harms the employment status of Black agents.

34. Supervisors' evaluations are an important element in DEA's noncompetitive promotion system. See pages 695–696, *supra*. The numerical rating system used by the Career Board assigns 45 of the 100 possible points to performance evaluation; thus this factor has a great deal of weight in the competitive process. Racial disparities in performance evaluations contribute directly to disparities in both the noncompetitive and competitive promotion systems.

*Imposition of Discipline*

35. The imposition of discipline in DEA is left to the discretion of individual supervisors. Any supervisor may propose disciplinary action against one of his agents. The supervisor's supervisor then reviews the proposal and decides whether disciplinary action will be taken and what sanction will be imposed. If the agent wishes to contest a disciplinary action, he may follow a grievance procedure. However, allegations of racial discrimination are excluded from that procedure and may be pursued only by filing a formal EEO complaint.

36. DEA gives its supervisors little guidance in deciding when to take disciplinary action or what standards to impose. DEA's Standard Schedule of Disciplinary Offenses defines 39 punishable offenses, some of which are extremely vague. It states an authorized range of penalties for each offense, but for most offenses the range extends from the most lenient penalty (reprimand) to the most severe (removal). Within that range, there are no objective guidelines for selection of a penalty.

37. DEA does not review the imposition of discipline to determine whether it is imposed disproportionately on Blacks. The reports on disciplinary actions sent by the regions to Headquarters do not indicate the race of the agents receiving discipline. Neither the EEO office nor the personnel office reviews the racial incidence of discipline in DEA.

38. DEA's 1979 Affirmative Action Plan recognizes that DEA employees are disciplined differently for similar offenses.

39. The cases of Plaintiffs Morris Davis and Henry Segar exemplify this pattern. Davis was removed by DEA on March 18, 1976, in a disciplinary action. He sought review of that action by the Federal Employee Appeals Authority of the Civil Service Commission. That body ruled on May 21, 1977, that race was a factor in Davis' removal, and ordered him reinstated. The Appeals Authority concluded, after reviewing four incidents dealing with vehicle violations involving Blacks and 25 such incidents involving non-Blacks, that "[i]n view of the disposition of these other cases, and the clearly disproportionately milder disciplinary actions taken against non-Black agents ... the difference in severity between appellant's conduct as compared to the other examples cited does not comport with the difference in severity of the punishments imposed. We find, therefore, that race was a consideration in [Morris H. Davis'] removal."

40. Plaintiff Henry Segar was removed by DEA on February 28, 1975, in a disciplinary action. He sought review of that action by the Complaint Adjudication Officer of the Department of Justice, who decided on March 28, 1978, that Segar's removal was an act of racial discrimination and of reprisal. Segar was restored to his position with DEA on June 26, 1978. The Complaint Adjudication Officer found, *inter alia*, that "the figures in the file reflecting minority employment on the Special Agent workforce in both the New York Task Force and the New York Regional Office in 1973 and 1974 are so grossly disproportionate as to raise serious concern about the employment practices regarding Special Agents in those offices . . . ."

41. To avoid any appearance on the Government's part of unfairly hindering Title VII lawsuits, the Attorney General has stated that the Government will not attempt to contest a final agency or Civil Service Commission finding or discrimination by seeking a trial *de novo* in those cases where an employee who has been successful in proving his claim before either the agency or the Commission files a civil action seeking only to expand upon the remedy proposed by such final decision. Thus, Defendants are bound in this action by the decision of the Complaint Adjudication Officer with respect to Segar.

42. The discriminatory imposition of discipline harms Black agents directly because they receive unwarranted and unjustly severe punishment. It harms them indirectly by adversely affecting their prospects of promotion, because an agent's disciplinary record is considered when he seeks promotion.

### Defendant's EEO Program

43. Administrative decisions and official reports have placed the DEA on notice over the last eight years that discrimination against Black agents existed and exists within the agency. Yet the EEO office has failed to conduct the systemic studies which are the necessary first step to the detection and remediation of that discrimination. The EEO office has limited its role to responding to individual complaints, despite the fact that DEA's practices in areas such as supervisory evaluations, promotions, work assignments, and discipline has had an adverse impact on Black special agents.

44. Defendants presented the testimony of several high level DEA officials that demonstrated their concern for possible discrimination in DEA. Their approach, however, was similar to the EEO office's view that any discrimination at DEA existed solely in interpersonal contacts between special agents, their supervisors, and those with ultimate authority at DEA. By focusing on individual complaints and individual behavior, both the senior DEA officials and the EEO Office avoided the larger issue, *viz.*, the extent to which the whole DEA operation serves to discriminate against Black special agents. The perception that discrimination at DEA is primarily a problem of interpersonal dynamics necessarily precludes systemic changes essential to the elimination of race discrimination at DEA.

### The 1978 Domestic Reorganization

45. The 1978 domestic reorganization was effected to provide better uniformity in policy direction and to eliminate unnecessary layering. Administrator Bensinger had determined that there were too many supervisors in the field and that a problem was created because the numerous regional directors were interpreting certain policies differently and competing for resources and investigative leads.

46. Nelson Coon, the Assistant Administrator for Administration and Management, was the project officer involved in planning and carrying out the reorganization. The reorganization process was as follows: A team was set up in the spring of 1977 to look not only for reorganization possibilities but better use of manpower through the technique called "Tables of Organization." During the summer of 1977, various concepts were discussed. In May, 1977, five regional directors were brought to Headquarters to look at the first efforts of the team. Arthur Lewis, the highest ranking

Black Special Agent and then Regional Director from Philadelphia, was among the five regional directors brought in. The decision process came to a head in the latter part of 1977, at which time the Administrator selected from the three or more alternatives which had been developed by the team. Between then and the Attorney General's final approval in February, 1978, there was a series of briefings held in Headquarters for senior office heads, including the Equal Employment Opportunity Director. In February, 1978, transition teams were set up to carry out the reorganization. Each of the teams had an EEO representative. The reorganization was made fully effective on October 1, 1978. During the summer of 1977, the agency consolidated the Philadelphia and Baltimore regions. Arthur Lewis was made Regional Director of the new region. When this pilot reorganization occurred in 1977, Bensinger had not contemplated that the resulting new Philadelphia Region would be abolished in the ultimate reorganization.

47. During the reorganization, consideration was given to the impact that it might have on minorities. The EEO office prepared a paper on the status of minorities in DEA. The paper was sent to the Acting Deputy Administrator, Mr. Lewis. In addition, EEO representatives were included in the planning and implementation sessions. The EEO representatives were pleased at the final decisions on the choices for many of the top positions. Because the main concern in the reorganization was not who was going to get new jobs, but who was going to survive, the minorities did fairly well in the view of the EEO representatives. There were 26 assistant regional directors before the reorganization. This was a layer of supervision which DEA felt it could do without. Of those 26, three were Black. As a consequence of the reorganization, two of those Black assistant regional directors, Carl Jackson and Jack Peterson, were elevated in status (although lowered in grade and rank) in the organization and became the operational heads of the two largest offices—New York and Los Angeles. The third Black assistant regional di-

rector, Kenneth Cloud of Kansas City, came to Headquarters as a division chief and is the responsible officer for all of Europe and the Middle East. There was a reduction of the regional directors from 12 to five. Of the seven persons who were to lose their regional directorship, two were supergrades, John Lund in Denver and Arthur Lewis in Philadelphia. Of the other five, all of them were losing their supergrade opportunity because their jobs had previously been classified as GS–16s. They were awaiting the availability of supergrade positions. Of those five, four positions were occupied by Whites and one was vacant.

48. Arthur Lewis was the only officer in the reorganization who kept his grade and was not to be transferred geographically. The positions of Carl Jackson and Jack Peterson as special agents in charge of the two largest regions are positions which are considered supergrade or GS–16 positions. DEA has submitted proposals to the Department of Justice to raise those positions to GS–16, but to date this has not been effectuated. At the GS–14 level, a surplus of persons was created by the reorganization because some GS–14 group supervisor positions were eliminated. According to Aaron Hatcher, DEA's Black Personnel Director, Blacks were not adversely affected by the reorganization because they received equivalent or higher positions as a result. Joseph Dino and Donald Young, both Whites, were reduced in rank or status due to the reorganization. There is no evidence of any Black agent who was reduced in rank or status. With respect to Lewis' allegations regarding the impact of the reorganization on him, it is noted that (1) Lewis knew about and was personally involved in the planning and implementation of the reorganization; (2) there was never a time when he was Acting Deputy during the planning and implementation of the reorganization that he told anyone that he wanted to get back to his region; (3) when he learned that Justice had indicated they wanted to name someone from outside the agency as Deputy, he was happy to go back to Philadelphia; (4) he believed the reorga-

nization was a sound management program which he supported totally; (5) Bensinger told him that he had submitted Lewis' name to Justice for the Deputy Administrator position; (6) he had no personal knowledge of the present status of the vacant Deputy Administrator position; (7) Lewis was not downgraded to GS–15 after the reorganization while white former regional directors were; (8) Lewis is the only GS–16 Special Agent in Charge; and (9) he has not complained formally or informally about anything that has happened to him in DEA since 1972.

49. Lewis testified that he knew of no other Black supervisors who lost their jobs in the reorganization other than himself. The reduction to five regions minimized the chances for progression and opportunity, in that it made more people at the bottom not eligible to be promoted to other grades. Accordingly, because Blacks were already behind prior to that circumstance, they will now fall farther behind because the opportunities are not there. This reduced opportunity for group supervisory positions after the reorganization has affected all agents, but has affected Blacks differently. Lewis stated that he does not think that this was racially motivated. In fact, Lewis believed that the 1978 reorganization was sound because for the first time it developed a management program that separated program responsibility and policy responsibility. He felt that Bensinger's philosophy of management of reducing the number of regions was a sound philosophy which worked well. He agreed that the number of regions should be reduced from 12 to five, did not recommend against the reorganization to Bensinger and, in fact, supported it totally.

50. Carl Jackson, the Special Agent in Charge in New York, and Jack Peterson, the Special Agent in Charge in Los Angeles were hurt by the reorganization. Although Lewis agreed that Jackson and Peterson moved to positions of higher responsibility after the reorganization, he pointed out that those positions have less authority, in terms of grade and rank, than was indicated during the reorganization. Jackson and Peterson had not yet received their

GS–16s, which Lewis understood was to happen following the reorganization. Lewis also felt that the concept of giving special agents in charge of the major offices program control in order to prepare them to be regional directors or deputy regional directors has been rejected, which has affected Jackson and Peterson.

*Testimony of Black Special Agents*

51. In support of the allegations of class-wide discrimination against Black special agents, Plaintiffs presented the testimony of one named Plaintiff, eight special agents, and one former Black agent trainee. This testimony may be summarized as follows:

a. The testimony was unequivocal in depicting the feelings and perceptions of the special agents that (1) they themselves were constantly discriminated against in the workplace, (2) that this discrimination was the result both of subliminal discrimination by their supervisors and systemic discrimination at DEA; and (3) that all other Black special agents suffered from both discrete acts of discrimination and systemic discrimination.

b. In some instances, the witnesses' testimony was corroborated by statistical and/or documentary evidence. For example, the testimony regarding systemic discrimination in supervisory evaluations, promotions, work assignments, and discipline lent support to the statistical and/or documentary evidence regarding those claims.

c. In other instances, the testimony supported the DEA's contentions. For example, the testimony of agent Blackburn indicated that DEA's use of Schedule A appointments was not discriminatory. Likewise, the testimony of several agents that Blacks were not given equal opportunities in training was contradicted by at least one other Black special agent, and is unsupported by nontestimonial evidence.

d. Moreover, the allegations of specific discrimination presented by Black special agents was not corroborated by other evidence, and was substantially refuted by

government witnesses. Defendants proved that the specific acts alleged did not occur because of the agent's race.

e. Defendant's proof regarding the specific acts cited by the Black DEA agents goes no farther than those acts. It does not indicate that the pervasive feeling among Black agents that DEA discriminates against them on the basis of race is either ill-conceived or irrational. Rather, the Court notes that the systemic discrimination existing at DEA provides an ample rational foundation for the perceptions of those agents. The agents' belief in the existence of race discrimination at DEA remained undaunted in the face of vigorous and highly competent cross-examination. The perceptions of the high ranking Black agents, who are respected in their field, intelligent, and trained to detect the nuances of a particular situation, are probative of the existence of race discrimination at DEA, and support the statistical and documentary evidence.

## CONCLUSIONS OF LAW

### A. Legal Background

1. This Court has jurisdiction over this litigation pursuant to 42 U.S.C. §§ 2000e–5(f)(3) and 2000–16. *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

2. The proscription against employment discrimination on the basis of race in Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16, applies to Federal agencies. *Berrio v. EEOC*, 18 FEP 1213 (D.D.C.1979).

3. What establishes a *prima facie* case varies from case to case and is not a rigid formula to be applied without variation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973); *Teamsters v. U. S.*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977).

4. Generally, there are two types of Title VII cases, those which involve "disparate treatment" of individuals and those which involve "disparate impact" on classes of people. *Teamsters v. U. S.*, 431 U.S. at 335 n.15, 97 S.Ct. at 1855 n. 15. In either type of Title VII litigation, Plaintiff must initially establish a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824; *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).

5. The burden of proof in Title VII litigation always remains on the Plaintiff. After the establishment of a *prima facie* case, however, the burden of persuasion shifts to the employer. This burden requires the Defendant to "articulate some legitimate, nondiscriminatory reason." *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). If the Defendant meets the rebuttal burden, the Plaintiff has an opportunity to show that the apparently legitimate reason is, in fact, a pretext. *Kinsey v. First Regional Sec., Inc.*, 557 F.2d 830, 836 (D.C. Cir.1977).

6. Disparate impact involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters v. U. S.*, 431 U.S. at 336 n.15, 97 S.Ct. at 1854–55 n.15. To prove a *prima facie* case under a disparate impact theory, a plaintiff need only show that the challenged practice or procedure, although facially neutral, has a discriminatory effect. *Dothard v. Rawlinson*, 433 U.S. at 329, 97 S.Ct. at 2726–27.

7. Disparate treatment exists when an employer treats some individuals less favorably than others because of their race, color, religion, sex, or national origin. *Teamsters v. U. S.*, 431 U.S. at 335 n.15, 97 S.Ct. at 1854–55 n.15. Proof of disparate treatment differs from proof of disparate impact in that it requires a showing that the employer acted with a discriminatory motive or intent. *Id.* Discriminatory mo-

tive may however, be inferred "from the mere fact of differences in treatment." *Id.*

■ 8. Statistical evidence alone is sufficient to establish a *prima facie* case of discrimination. *Hazelwood School District v. U. S.*, 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977); *Davis v. Califano*, 613 F.2d 957, 962–965 (D.C.Cir. 1979). Since statistical disparities may suffice to establish a discriminatory motive, *a fortiori* they are sufficient to establish a *prima facie* case when a showing of motive is not required.

■ 9. Statistical evidence may be rebutted in two ways. A party may show that his opponent's statistics are either "inaccurate or insignificant." *Teamsters v. U. S.*, 431 U.S. at 360, 97 S.Ct. at 1867. Statistical proof such as regression analyses and cohort analyses may be deemed insignificant if relevant factors are excluded from the analyses or obfuscating variables are included. The burden is on the opposing party to clearly rebut statistical evidence; hypotheses or conjecture will not suffice. *See Pennsylvania v. Local 542, Operating Engineers*, 469 F.Supp. 329, 370–375 (E.D. Pa.1978). When a plaintiff submits accurate statistical data, and a defendant alleges that relevant variables are excluded, defendant may not rely on hypothesis to lessen the probative value of plaintiff's statistical proof. Rather, defendant, in his rebuttal presentation, must either rework plaintiff's statistics incorporating the omitted factors or present other proof undermining plaintiff's claims. *Davis v. Califano*, 613 F.2d at 964.

### B. Salaries

■ 10. Plaintiffs have shown gross disparities between the salaries of comparably qualified Black and White agents at DEA. These disparities are evident in the regression analyses involving all agents for the period 1975–1978, and new hires for the period 1976–1978. Because of the significant level of the disparities shown, Plaintiffs have proven a *prima facie* case of discrimination in salary. Defendants have attempted to rebut this proof through the presentation of cohort analysis. The cohort analysis was irreparably flawed, however, and is devoid of probative value. Thus, Defendants' presentation of statistical evidence did not show that Plaintiffs' evidence was either inaccurate or insignificant. *Teamsters v. U. S.*, 431 U.S. at 360, 97 S.Ct. at 1867.

11. Defendants alleged that Plaintiffs statistics were insignificant because relevant factors (e. g. pre-1972 discrimination, inflation, and specific types of prior work experience) were omitted from the regression analyses. Defendants' criticisms were never empirically based, however, although Defendants had the capability of testing their various objections. The fact that Defendants choose not to test their hypotheses leaves their criticisms speculative and incapable of rebutting Plaintiffs' statistical showing. *Pennsylvania v. Local 542 Operating Engineers*, 469 F.Supp. at 370–375.

12. Finally, Defendants contend that DEA's promotion criteria must be factored into a regression analysis if it is to have significant probative value. Because the promotion criteria are subjective, they are themselves subject to employer discrimination. Thus, it would be improper for Plaintiffs to include promotion criteria in their regression analyses. *See James v. Stockham Valves and Fittings Co.*, 559 F.2d 310, 345–47 (5th Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

13. Defendants have neither rebutted Plaintiffs' proof nor shown any justification for the salary disparities between comparably qualified Black and White agents at DEA. Accordingly, this Court concludes that Defendants have discriminated against Black agents as a class with respect to salary in violation of Title VII.

### C. Grade at Entry

■ 14. When decisions on grade at entry are made in a subjective fashion by numerous officials, without objective standards guiding the exercise of discretion, there is a great potential for abuse. Plaintiffs have shown by statistical evidence that DEA's subjective, regionalized method of

decisionmaking on grade at entry has had disparate impact on Black agents, and have thus proven a *prima facie* case of discrimination.

15. Defendants attempted to rebut Plaintiffs statistics by showing that they were both inaccurate and insignificant. Defendants failed to prove these allegations, however, relying on either hypotheses or unsubstantiated technical criticisms rather than empirical data. *Pennsylvania v. Local 542 Operating Engineers*, 469 F.Supp. at 370–375. Defendants also presented statistical evidence tending to rebut Plaintiffs' statistics. Because Defendants used an inferior method of analysis, and their results were not significantly different from Plaintiffs', the Court does not accord Defendants studies great probative value.

16. Plaintiffs attempted to support their statistical evidence with the testimony of several Black agents. This testimony did not serve its stated objectives; Defendants successfully rebutted the testimony at every turn. In no way does the testimony undercut the statistics, however, or rebut Plaintiffs' *prima facie* showing of disparate impact.

17. Defendants have not validated DEA's method of decision-making on grade at entry by showing that it has "a manifest relationship to the employment in question." *Furnco Const. Co. v. Waters*, 438 U.S. 579–80, 98 S.Ct. 2950–51, quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *see* Uniform Guidelines on Employment Selection Procedures, 43 Fed.Reg. 38297 (August 25, 1978); 28 C.F.R. § 50.14. Accordingly, this Court finds that Defendants have discriminated against Black agents with respect to grade at entry.

### D. Work Assignments

18. It is unlawful employment practice for an employer to create a pattern of disparate work assignments based on race. The evidence in this case overwhelmingly indicates that DEA assigned Black agents to undercover work far more frequently than White agents. Defendants have even admitted that race is a factor in the allocation of work assignments. Plaintiffs have proven a *prima facie* case under both the disparate impact and disparate treatment theories that Defendants discriminated against Black agents in work assignments.

19. Disproportionate assignment to undercover work adversely affects Black agents in that it exposes them to greater dangers and hardships, precludes obtaining the "breadth of experience" that is a critical consideration for promotion to supervisory positions, teaches a limited range of skills, and impairs their ability to remain current with administrative duties. Defendants have failed to articulate legitimate, non-discriminatory reasons for the disparate pattern of work assignments. Defendants' general and untested assumption that Blacks must be used to make undercover buys from Blacks does not justify their discrimination. Defendants have not shown that race is a "bona fide occupational qualification reasonably necessary to the normal operation" of DEA. 42 U.S.C. § 2000e–2(e).

20. Assuming *arguendo* that Defendants' conjectural assumption proved accurate, the assignment of agents on the basis of race would still violate Title VII. The Act provides that it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e–2(a)(1). The Act further provides an exception to this proposition if the employer can show that his discrimination is based on a "bona fide occupational qualification." 42 U.S.C. § 2000e–2(e). Section 2000e–2(e) does not provide this exception for discrimination on the basis of color or race. Rather, it is limited to those circumstances where *religion, sex, or national origin* is a bona fide occupational qualification." (emphasis added). Thus, the Court concludes that Defendants have discriminated against Black special agents in work assignments.

### E. Supervisory Evaluations

21. Plaintiffs' unrebutted evidence establishes that DEA's supervisory evaluation system has a disproportionate impact on Black agents and adversely affects their status as employees. This evidence is sufficient to make out a *prima facie* case of racial discrimination and to shift the burden to Defendants to demonstrate that their evaluation system has "a manifest relationship to the employment in question" *Griggs v. Duke Power Co.*, 401 U.S. at 432, 91 S.Ct. at 854.

22. When subjective evaluations are an important factor in the promotion process and are shown by statistical evidence to have an adverse impact on Blacks, the inference arises that they discriminatorily affect promotions. Defendants must therefore demonstrate that they are related to job performance and are justified by business necessity. *U. S. v. Chicago*, 573 F.2d 416, 425 (7th Cir. 1978).

23. Defendants have failed to meet this burden. They did not and cannot demonstrate that the evaluation system is related to job performance or that it serves any legitimate business need. DEA does not have the information necessary to demonstrate this because it admittedly "has not, with respect to the position of special agent, undertaken a job analysis . . ." and "has not, with respect to the promotion criteria and standards for special agents undertaken any validation studies or reports or validity studies or reports . . . ." Absent such studies, Defendants cannot determine or demonstrate that the evaluation system is related to job performance. *U. S. v. Chicago*, 573 F.2d at 427–428. Defendants' supervisory evaluation process violates Title VII.

### F. Discipline

24. Plaintiffs have shown and Defendant have admitted that Black agents at DEA are disciplined far more frequently than White agents, as measured against their representation in the DEA workforce. Plaintiffs have also shown that, of the agents who are disciplined, Blacks receive a significantly disproportionate share of the most severe punishments. The statistical evidence is itself sufficient to establish a *prima facie* case regarding discipline. *See Hazelwood School District v. U. S.*, 433 U.S. 307–308, 97 S.Ct. 2741–42. Moreover, the non-statistical evidence, including prior administrative findings of racial discrimination in discipline, support the inference of discrimination gleaned from the statistical evidence. *See Teamsters v. U. S.*, 431 U.S. at 339, 97 S.Ct. at 1856.

25. Defendants have not validated DEA's subjective disciplinary system by showing that it has "a manifest interest to the employment in question." *Furnco Const. Co. v. Waters*, 438 U.S. at 579–80, 98 S.Ct. at 2950–51; *Griggs v. Duke Power Co.*, 401 U.S. at 432, 91 S.Ct. at 849. They have performed no validity or validation studies, *see U. S. v. Chicago*, 573 F.2d at 425–428, and DEA's 1979 Affirmative Action Plan recognizes that DEA employees are disciplined differently for similar offenses. Plaintiffs have therefore proven that Defendants have discriminated against Black special agents with respect to discipline.

### G. Promotions

26. Plaintiffs' statistical evidence did not establish a *prima facie* case regarding positions filled through the Career Board process. The statistics did establish, however, that a significant disparity exists in promotions from GS–11 to GS–12. The statistics involving promotions to GS–13 through GS–18 levels are insignificant, primarily due to the necessarily small number of agents considered in the regression analyses. Thus, the statistics alone did not establish a *prima facie* case of discrimination in promotions, with the exception of promotions from GS–11 to GS–12.

27. The non-statistical evidence firmly established discrimination in promotions, however. Work assignments, supervisory evaluations, and disciplinary actions all significantly affect an agent's promotional ability. In all of these areas, Defendants discriminated against Black agents. Thus, the Court concludes that Plaintiffs proved a

*prima facie* case of discrimination in promotions.

28. Defendants failed to rebut Plaintiffs' showing of discrimination. They have validated neither the Career Board scoring system nor the non-competitive promotion procedures. *See U. S. v. Chicago*, 573 F.2d at 425–428. Thus the Court concludes that Defendants discriminated against Black agents in promotions.

#### H. Schedule A Appointments

■ 29. Plaintiffs presented no probative statistical or testimonial evidence that Defendants' use of Schedule A appointments had a disproportionate impact on Black agents. They thus failed to prove a *prima facie* case in this area. The Court finds that Defendants did not discriminate against Black agents with their use of Schedule A appointments.

#### I. Training

■ 30. Plaintiffs produced no statistical evidence regarding discrimination in training. The testimony of some Black special agents that discrimination in training existed at DEA was rebutted by the testimony of other Black special agents and defense witnesses. Plaintiffs have failed to prove that Defendants discriminated in training.

#### J. Harrassment and Reprisal

■ 31. Plaintiffs have presented unsubstantiated allegations of harrassment and reprisal against Black agents for their efforts to promote equal employment opportunity at DEA. All testimony regarding specific acts of harrassment and reprisal was successfully rebutted by Defendants. Plaintiffs thus failed to prove the existence of harrassment and reprisal at DEA.

An appropriate Order follows this Opinion.

#### ORDER

Upon consideration of the Findings of Fact and Conclusions of Law entered this date and the entire record herein, it is by the Court this 6th day of February, 1981,

ORDERED, that JUDGMENT be and hereby is entered for Plaintiffs on their claims alleging discrimination against Black special agents regarding (a) salary, (b) grade at entry, (c) work assignment, (d) supervisory evaluation, (e) discipline, and (f) promotion; and it is

FURTHER ORDERED, that Defendants shall cease such discrimination FORTHWITH; and it is

FURTHER ORDERED, that Defendants shall immediately commence validity studies in order to implement effective, non-discriminatory supervisory evaluation, discipline, and promotion systems; and it is

FURTHER ORDERED, that Defendants shall insure that said systems as operated have neither a disparate impact on Black agents nor effectuate disparate treatment of Black agents; and it is

FURTHER ORDERED, that JUDGMENT be and hereby is entered for Defendants regarding Plaintiffs claims of discrimination in (a) use of Schedule A appointments, (b) training, and (c) harrassment and reprisal; and it is

FURTHER ORDERED, that the parties shall indicate to the Court, on or before February 27, 1981, what action is necessary to remedy the discrimination in salary and grade at entry and further remedy the discrimination in promotion.